IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED AVILES            §
                                 §
v.                           §         C.A. NO. C-11-301
                                 §
MICHAEL J. ASTRUE      §

**MEMORANDUM AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Alfred Aviles brought this action on September 16, 2011, seeking review of the Commissioner's final decision that he is not disabled and, therefore, not entitled to supplemental security income or disability insurance benefits.  (D.E. 1).  On December 23, 2011, Defendant filed a motion for summary judgment.  (D.E. 6).  Plaintiff filed a motion for summary judgment on January 12, 2012.  (D.E. 9).  On February 10, 2012, Defendant submitted a response.  (D.E. 10).  For the reasons that follow, it is respectfully recommended that Plaintiff's motion for summary judgment be denied, and Defendant's motion for summary judgment be granted.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.  BACKGROUND

On October 3, 2008, at the age of fifty, Plaintiff filed a claim with the Social Security Administration for supplemental security income and disability insurance benefits.  Tr. 131-41. In both claims, he alleged a disability period beginning from September 22, 2008.  Tr. 131, 139. The claims were denied on December 16, 2008.  Tr. 67-74.  Plaintiff appealed, and his appeal was denied on March 12, 2009.  Tr. 80-85.  He requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 20, 2010.  Tr. 25-62.  On June 25, 2010, the ALJ issued a decision denying both supplemental security income and disability benefits.  Tr. 14-20.

The Social Security Administration denied Plaintiff's request to review the ALJ's decision, Tr. 1-3, and on September 16, 2011, he filed this action.  (D.E. 1).

A.     **Plaintiff's Medical Records.**

Plaintiff's alleged impairments consist of chest pains due to heart problems, arthritis in all joints, diabetes, high blood pressure, vision problems, and emphysema.  Tr. 175.

1.     **Plaintiff's chest pain.**

On January 17, 2008, Plaintiff was examined for chest pain by Dr. Victor H. Gil, who found nothing abnormal.  Tr. 257.  The next day, a nuclear imaging study was performed by Dr. John D. Pappas, who concluded that there was "no evidence of myocardial ischemia or infarction" from either the stress or rest images.  Tr. 255.  On January 28, 2008, Plaintiff's primary care physician, Dr. David P. Foster, diagnosed and treated him for coronary heart disease.  Tr. 309.

On May 7, 2008, Dr. Derwyn M. Toups found that Plaintiff's "heart is normal size," his "lungs are clear," and "pulmonary vascularity is normal."  Tr. 245.  He also noted that there had not been any significant change in his condition since January 17, 2008.  Id.  Dr. Robert W. Madry performed a left heart catheterization the next morning and found that Plaintiff had "normal left ventricular size and systolic function," noting an "anomalous origin of the right coronary artery from the left coronary cusp," and "widely calcified coronary arteries with no areas of significant luminal stenosis."  Tr. 247, 254.  Dr. Madry recommended medical therapy. Id.  After the procedure, Dr. Barbara Lopez diagnosed Plaintiff with chest pain of a noncardiac origin and hyperlipidemia.[1]  Tr. 250.  She then discharged Plaintiff after making prognosis of "fair," but provided instructions to restrict his diet and take medications.  Tr. 251.

---

[1] "Hyperlipidemia" refers to "elevated concentrations of any or all of the lipids in the plasma."  Dorland's Illustrated Medical Dictionary 852 (29th ed. 2000) [hereinafter Dorland's].

2

In an assessment made on December 4, 2008, Dr. Randy Terrell determined that Plaintiff had hypertension, chronic obstructive pulmonary disease, and coronary artery disease with angina pectoris.[2]  Tr. 323.

**2.        Plaintiff's joint pain.**

On May 6, 2005, Plaintiff saw Dr. Dillon C. Chen for shoulder pain.  Tr. 262.  Dr. Chen diagnosed him with tendinosis of his rotator cuff, but found no evidence of a tear.  Id.  On January 31, 2006, Dr. Jon T. Watson examined both of Plaintiff's wrists and hands, but found "no evidence of acute fracture or dislocation."  Tr. 258-61.

Plaintiff was eventually treated for arthralgia[3] by Dr. Foster on June 2, 2008 after complaining about joint pain.  Tr. 304.  On December 4, 2008, Dr. Terrell diagnosed him with rotator cuff tendinopathy[4] of the left shoulder.  Tr. 323.  An accompanying range of motion chart measuring Plaintiff's ability to move both his arms was also produced during this examination.  Tr. 324.  Following an x-ray examination conducted on December 8, 2008, Dr. D. Burk Strong determined that he had a normal right hip.  Tr. 325-26.  On December 9, 2008, Dr. Moira Dolan, a medical consultant who was assessing Plaintiff's residual functional capacity, found that his "[range of motion] is limited in his left shoulder[:] forward elevation, abduction & external rotation."  Tr. 330.

Plaintiff submitted to physical therapy on his right shoulder from around May to July 2009.  Tr. 358-82.  During this time and into the month of August 2009, Dr. Foster treated him

---

[2] "Angina pectoris" is "a paroxysmal thoracic pain, often radiating to the arms, particularly the left, sometimes accompanied by a feeling of suffocation and impending death; it is most often due to ischemia of the myocardium and precipitated by effort or excitement."  Dorland's, at 81.

[3] "Arthralgia" refers to "pain in a joint."  Dorland's, at 151.

[4] "Tendinopathy is an injury to the tendon."  Tendinopathy, UPMC, http://www.upmc.com/healthatoz/ pages/healthlibrary.aspx?chunkiid=11518.

for right upper extremity impingement in response to his complaints of right shoulder pain.  Tr. 386-88.  Nevertheless, Dr. Foster observed that Plaintiff had otherwise normal musculoskeletal, skin, lymphatic, and neurologic examinations.  Id.  On July 29, 2009, Plaintiff had a magnetic resonance imaging of his right shoulder,[5] which revealed a nondisplaced superior labral tear and tendinopathy, but no rotator cuff tear.  Tr. 390.

### 3. Plaintiff's diabetes.

The record indicates Plaintiff had been diagnosed with type II diabetes mellitus ten years prior to his meeting with Dr. Foster on September 24, 2007.  Tr. 314.  Dr. Lopez, Dr. Madry, and Dr. Terrell also noted that he had diabetes.  Tr. 250, 273, 323.

### 4. Plaintiff's blood pressure.

Dr. Madry diagnosed Plaintiff with hypertension on May 8, 2008 before performing left heart catheterization.  Tr. 273.  Immediately following this procedure, Dr. Barbara Lopez also diagnosed Plaintiff with hypertension.  Tr. 250.  Dr. Terrell also reached this diagnosis on December 4, 2008.  Tr. 323.

### 5. Plaintiff's vision.

During Dr. Terrell's December 4, 2008 examination, he found that Plaintiff had 20/30 vision in his right eye and 20/40 vision in his left eye.  Tr. 322.  When corrected with his prescription eyeglasses, he possessed 20/25 vision in his right eye and 20/25 vision in his left eye.  Id.  Dr. Dolan did not note any visual limitations during her examination of his vision on December 9, 2008.  Tr. 330.

### 6. Plaintiff's emphysema.

Dr. Foster, Dr. Madry, and Dr. Lopez all reported that Plaintiff had a thirty-seven year

---

[5] Although the medical report states that Plaintiff's "right knee" was imaged, Tr. 390, Dr. Cox testified that the image is "clearly the right shoulder."  Tr. 32.

history of smoking one pack of cigarettes per day.  Tr. 250, 272.  Dr. Terrell also noted that his medical history included emphysema.  Tr. 321.  On December 9, 2008, however, Dr. Dolan noted that she could not find any indication of emphysema.  Tr. 334.

**B.    Plaintiff's Administrative Hearing.**

On May 20, 2010, an administrative hearing was held to examine Plaintiff's claims.  Tr. 25-62.  At the hearing, he was represented by his attorney, Joshua Eyestone.  Tr. 25.  Plaintiff testified, as well as Alice Cox, a medical doctor, and Donna Johnson, a vocational expert.  Tr. 25.

Dr. Cox testified first, opining that Plaintiff did not meet or equal any of the listings.  Tr. 29.  Asked what limitations she would place on Plaintiff's working capacity as a result of his physical limitations, she responded that he thought he should be placed in the "light category," meaning that he could lift twenty pounds occasionally, as well as ten pounds frequently.  Tr. 33.  Dr. Cox believed Plaintiff's ability to stand or walk should be limited to six hours a day, and that his ability to sit should also be limited to six hours a day.  Id.  She ruled out any jobs that involved the use of ladders and overhead bilateral activity, and she also thought that he needed to avoid concentrated exposure to fumes, such as industrial smoke.  Id.

In response to the ALJ's questions, Plaintiff testified that he had previously worked in the restaurant industry as a cook and a manager, and he was living in a house with his wife and three children.  Tr. 34-36.  Plaintiff's activities included feeding his four-year-old child on a daily basis, as well as shopping with his wife and playing Texas Hold'em every other week.  Tr. 37-38.  However, he complained that his breathing problems were causing him to move "at a snail's pace."  Tr. 40.

Plaintiff's attorney also asked questions to further illuminate the nature and scope of his

health condition.  He averred that he took NitroQuick for his chest pains, which would result when he was "over-exerting."  Tr. 42.  He most recently used NitroQuick after he had been mowing and weeding the yard for twenty minutes.  Tr. 43.  He also discussed his joint pain and how it restricted his range of motion.  Tr. 43-44.  Not only was he no longer able to lift his arms above his head, he was also unable to even extend his arms straight in front of him at shoulder level.  Tr. 45.  When his attorney directed him to talk about his hand problems, Plaintiff replied that he had tingling in his fingers and that he wakes up with swollen hands.  Tr. 46.  While this did not affect his ability to use a spatula, he was unable to clean the grill using the scraper because he lacked the grip strength to get the grill clean.  Tr. 47.  Plaintiff also recounted experiencing right hip pain when he is in motion, which he most recently felt while mowing the lawn.  Tr. 48.  His arthritic pain extended to his knees, preventing him from squatting.  Tr. 48.

Plaintiff also elaborated more specifically about how he was unable to effectively perform his restaurant jobs.  He testified that he had to quit his managerial position because he was unable to train new employees while coping with his chest pain.  Tr. 49.  Even when he was working part-time, he had to reduce his workload from twenty hours per week to about ten hours per week.  Id.  Because of the management's decision to understaff personnel on each shift, Plaintiff found himself unable to do his own job while also performing duties normally assigned to other employees.  Tr. 50.  He testified that he could only stand in fifteen to twenty minute intervals due to pain in his right hip, and he was unable to sit for more than twenty to thirty minutes.  Tr. 51-52.  In addition to being unable to squat, he also reported being dizzy after bending at his waist and requiring the use of both hands to lift a gallon of milk.  Tr. 52-53.  Plaintiff's condition was aggravated by cold weather and cold working conditions, which prevented him from working in a walk-in refrigerator at the Texas Roadhouse.  Tr. 53.  Finally,

6

he described his energy level as being low due to his arthritis and shortness of breath.  Tr. 54.

The ALJ then asked Ms. Johnson the following hypothetical:

> If you'd assume an individual alleging disability at age 50 and he's
> currently 51.  He has an 11th grade education.  His past relevant
> work is noted in the E section of the exhibit file.  I'd like to impose
> these limitations on the first hypothet[ical].  He should not work
> where there are excessive or concentrated exposure to odors, dusts,
> gases or poor ventilation as a condition of employment.  He would
> have virtually no overhead with the left upper extremity.  The right
> I'm not going to so restrict.  The lift and carry would be 20 pounds
> occasionally and 10 frequently.  Ten pounds is roughly a gallon of
> milk, which weighs 8.8 pounds.  Sit, stand and walk each six of
> eight, withe [sic] the normal breaks throughout the day.  No
> climbing of ladders, ropes and scaffolds because -- and no work at
> unprotected heights ... or around dangerous, moving machinery....
> Within the confines of that, my first hypothet[ical], I ask you,
> could he perform any of his past relevant work, either as he
> performed it or as it would normally be performed under the
> dictates of the *Dictionary of Occupational Titles*?

Tr. 55.  Ms. Johnson answered that such a hypothetical person could work as a fry cook or

restaurant manager.  Tr. 56.  The ALJ then added further restrictions to the hypothetical:

> Now let's assume that the individual fails to show up for work and
> it could be any factor.  The fact is, he doesn't show up for work.  It
> could be the fact he didn't feel that way that day, he had a doctor's
> appointment, one of his children was sick.  No matter what the
> rationale may be, and even if you have a doctor's excuse, it goes
> without saying, if you miss a certain amount of work, you're
> subject to termination.  What tolerance would they give on jobs
> such as you've cited?

Id.  Ms. Johnson replied that such a person would be terminated if he was unable to come to

work two days out of every month.  Id.  The ALJ then asked Ms. Johnson to disregard those

restrictions, and to consider a different set of facts regarding this hypothetical employee's

punctuality:

> But if you're on the job working, and you're tired, you're fatigued,
> you're short of breath, you need to lie down, you need to take a

7

> break, you have heart palpitations, you have some side effects of
> medication, no matter what the rationale may be, if you can't put
> in a full 8-hour day, 40-hour work week other than the breaks we
> enumerated, regardless of the type of job, how simple or
> complicated it may be, whether it be sedentary, light, medium,
> whatever, you can't perform to the minimal industrial standards
> and produce that certain amount of work for that time and that
> particular job without taking these excessive breaks, even if a
> doctor says you got to take breaks every 20 minutes, 30 minutes or
> lay down as needed, change positions as needed, that would really
> be inconsistent with any type of work.
>
> If you can't perform that job as the way it's normally performed
> because of whatever reason you may have, excuse or not, you're
> simply unemployable, correct?

Tr. 57-58.  Ms. Johnson responded in the affirmative.

Following the ALJ's questioning, Plaintiff's attorney posed a hypothetical of his own:

> [L]et me give you a hypothetical that builds on the Judge's first
> one.  So we can take the Judge's first hypothetical, no odors, dust,
> gases; no overhead with the left; sitting and standing, both for six
> out of eight; no dangerous heights or machinery.  But, then, if we
> could add to that no squatting or stooping, occasional handling and
> fingering. ...  But can you tell me if there's -- if that changes your
> assessment on the past work?

Tr. 58.  In light of these additional restrictions, Ms. Johnson agreed that both the fry cook and

restaurant manager positions were excluded.  Tr. 59.  She disagreed, however, when counsel

asked her whether fry cooking equipment was dangerous machinery and likely to produce odors

and gasses of the kind precluded by the ALJ's hypothetical.  Id.  She explained that "[a]

restaurant is a clean environment," id., but did concede that hot grease would be hazardous for a

person with seizures.  Tr. 60.  In response to the attorney's final question, Ms. Johnson agreed

that a person who had to take an additional ten percent or more of his time off over and above

the time normally allotted for breaks would "have difficulty sustaining employment."  Tr. 60-61.

8

C.      **The ALJ's Decision.**

On June 25, 2010, the ALJ issued an unfavorable decision for Plaintiff, concluding that he had not been "disabled" within the meaning of the Social Security Act since September 22, 2008, the alleged onset date.  Tr. 14-20.  He began by finding that while Plaintiff had worked after the alleged onset date, he had not engaged in substantial gainful activity after applying for benefits.  Tr. 15.  The ALJ then concluded that Plaintiff suffered from several severe impairments, listing them as coronary artery disease, chronic obstructive pulmonary disease, diabetes mellitus, and pain with decreased range of motion in the left shoulder.  Id.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met the listings.  Tr. 17.  To justify this conclusion, he stressed that his chronic obstructive pulmonary disease and coronary artery disease did not meet any of the requirements in the listings.  Id.  The ALJ also found that Plaintiff's poorly controlled diabetes mellitus did not satisfy the severity requirements of the listings because there was no neuropathy, acidosis, or retinopathy documented in the record.  Id.

The ALJ next calculated Plaintiff's residual functional capacity ("RFC"), finding him able to lift and carry twenty pounds occasionally as well as ten pounds frequently.  Id.  He further found him able to stand or walk about six hours a day, as well as sit for about six hours a day.  The ALJ also determined that Plaintiff was "limited in reaching with his left, but not the right upper extremity due to decreased range of motion."  Id.  As a result, he precluded any job requiring him to climb ladders, ropes, or scaffolds, or to work around dangerous machinery or unprotected heights.  Id.  In addition, he cautioned that Plaintiff should avoid concentrated exposure to odors, dust, gases, and poor ventilation.  Id.

In reaching this conclusion, the ALJ appeared to give significant weight to the testimony

of Dr. Cox and the assessment of Dr. Dolan.  Tr. 18-19.  He attributed Plaintiff's shortness of breath to his chronic obstructive pulmonary disease and chronic smoking habit.  Tr. 19.  While the ALJ took into account the range of motion loss for his left shoulder, he found that range of motion loss on the right shoulder was "mild at best."  Id.  He also noted the paucity of evidence supporting Plaintiff's allegation that he had decreased use of his hands.  Id.  The ALJ discounted Plaintiff's complaints of right hip pain because the x-ray tests did not reveal anything anomalous.  Id.

The ALJ specifically found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, ... the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible."  Id.  To underline his point, he references the fact that Plaintiff "performs many activities of daily living," such as raising his four-year-old child, playing poker, going grocery shopping, and doing lawn care.  Id.  He also found significant the fact that Plaintiff does yard work one or two times a month, was able to drive, and could lift thirty-five to fifty pounds.  Id.  The ALJ emphasized that no physician or medical professional had ever expressed an opinion that Plaintiff was unable to work or otherwise indicated anything contradicting his RFC finding.  Id.  Finally, he concurred with Ms. Johnson, that a hypothetical person with Plaintiff's age, education, past work experience, and the RFC assessment provided by Dr. Cox would be able to perform the job of fry cook and restaurant manager.  Id.

The ALJ found that Plaintiff had been a fry cook and restaurant manager within the past fifteen years, held the jobs long enough to learn them, and performed them at the substantial gainful activity level.  After he determined that being a fry cook or restaurant manager does not require the performance of work-related activities precluded by his RFC finding, the ALJ

10

determined that he could perform these jobs.  Correspondingly, he concluded that Plaintiff has

not been under a "disability" as defined by the Social Security Act from September 22, 2008 to

June 25, 2010, the date of the decision.  Tr. 20.

### III.  LEGAL STANDARDS

**A.**     **Social Security Act Disability Benefits Requirements.**

The same law and regulations govern whether an individual is considered disabled and

therefore entitled to benefits under either the disability insurance benefits or the supplemental

security income benefits provisions of the Social Security Act.  Haywood v. Sullivan, 888 F.2d

1463, 1467 (5th Cir. 1989) (per curiam) (citations omitted).  Specifically, the Social Security Act

establishes that every individual who is insured for disability insurance benefits, has not attained

the set retirement age, has filed an application for disability benefits, and is under a disability is

entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).

Disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that a claimant is not

disabled if that person can perform jobs available in the national economy:

> An individual shall be determined to be under a disability only if
> his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.  For purposes of the preceding sentence ... "work which
> exists in the national economy" means work which exists in
> significant numbers either in the region where such individual
> lives or in several regions of the country.

11

42 U.S.C. § 423(d)(2)(A).

**B.     Social Security Administration Regulations And Rulings.**

To determine if an individual suffers from a disability, as defined by the Social Security Act, the Commissioner has promulgated regulations containing a five-step sequential process to be used by the Social Security Administration.  20 C.F.R. §§ 404.1520, 416.920.  A disability finding at any point in the five-step sequential process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990) (citation omitted).

A claimant bears the burden of proof on the first four steps.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citation omitted).  The claimant must prove that: (1) he is not presently engaged in substantial gainful activity; (2) he suffers from an impairment or impairments that are severe; and that either (3) the impairment meets or equals an impairment listed in the appendix to the regulations; or (4) due to the claimant's RFC, the impairment prevents the claimant from doing any past relevant work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities."  Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000) (citations omitted).  The Commissioner may find that a claimant's impairment fails to meet the significant limitation requirement of step two "only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  Id. at 391 (citation omitted).

Step three requires a claimant to prove that any of his impairments meet one or more of

the impairments listed in the regulations, which include both physical and mental impairments.
20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria for determining the severity of the listed mental
impairments include whether there is marked interference with activities of daily living, social
functioning, concentration, persistence, or pace, and repeated episodes of decompensation.  Id. at
Pt. A § 12.00(C).  The regulation defines "episodes of decompensation" as "exacerbations or
temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as
manifested by difficulties in performing activities of daily living, maintaining social
relationships, or maintaining concentration, persistence, or pace."  Id. at Pt. A § 12.00(C)(4).
The claimant must present evidence that the impairment is a long-term problem rather than a
temporary set-back, but "does not have to show a 12 month period of impairment unmarred by
any symptom-free interval."  Singletary v. Bowen, 798 F.2d 818, 821 (5th Cir.  1986) (citations
omitted).

 Pursuant to the fourth step, a claimant who is unable to show that his impairment meets
one of the listed impairments must show that he is unable to perform his past relevant work.  20
C.F.R. § 404.1520(a)(4)(iv).  The claimant's RFC is taken into consideration to determine
whether his impairments may cause physical and mental limitations that affect his ability to
work.  20 C.F.R. §§ 404.1545, 416.945.  The RFC is the most a claimant can do despite any
limitations caused by an impairment.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  All relevant
evidence in the record, including medical and non-medical evidence, is taken into consideration
by the Commissioner when making a determination of a claimant's RFC.  20 C.F.R.
§§ 404.1545(a)(3), 416.945(a)(3).

 The Commissioner must consider all of a claimant's symptoms, including pain, and the
extent to which these symptoms can reasonably be accepted as consistent with the objective

medical and non-medical evidence in the record.  Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).  "[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. at *2.  When a claimant's statements concerning symptoms and their associated limitations "are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Id.

The adjudicator's discussion of a claimant's RFC must thoroughly discuss and analyze the objective medical and other evidence in relation to the symptoms.  SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996).  This discussion must include a resolution of any inconsistencies in the record, address a logical explanation of effects of the alleged symptoms on the individual's ability to work, contain a determination of why symptom-related functional limitations can or cannot be reasonably accepted as consistent with medical or non-medical evidence, and address any medical opinions contained in the record.  Id.

If the claimant is able to meet his burden under the first four elements, the burden shifts to the Commissioner for the fifth.  Bowling, 36 F.3d at 435.  The fifth step requires the Commissioner to determine, based on the claimant's RFC, age, education, and work experience, if the claimant can make an adjustment to other work that exists in significant numbers in the national economy.  20 C.F.R.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot make an adjustment to other work, the claimant is disabled.  Id.

**C.     Judicial Review Of The ALJ's Decision.**

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the

Commissioner's decision; and (2) whether the decision comports with relevant legal standards. See Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); accord Carey, 230 F.3d at 135.  The Fifth Circuit has described this burden as more than a scintilla, but less than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995) (citations omitted).  A finding of "no substantial evidence" occurs "only where there is a conspicuous absence of credible choices or no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam) (citation omitted).

If the Commissioner's findings are supported by substantial evidence, the Court must defer to the Commissioner and affirm the findings.  See Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002) (citation omitted).  In applying the substantial evidence standard, courts scrutinize the record to determine whether such evidence is present.  They do not, however, re-weigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner.  Id.; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted). Factual conflicts that exist in the record are for the Commissioner and not the Court to resolve. Masterson, 309 F.3d at 272.  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: "(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history."  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

# IV.  ANALYSIS

Plaintiff seeks a remand on the basis that the ALJ's decision is not supported by substantial evidence.  (D.E. 9).  Defendant argues that summary judgment should be granted in his favor because the ALJ's final decision that Plaintiff was not disabled was supported by substantial evidence and because he followed the correct legal standards in reaching his decision. (D.E. 6-1; D.E. 10).

## A.  The ALJ's Hypothetical Question Reasonably Incorporated All The Limitations Supported By The Record.

Plaintiff claims that the ALJ's hypothetical question to the vocational expert differs from his RFC finding, thus depriving the ALJ's decision of substantial justification.  (D.E. 9, at 4). Specifically, he contends that the ALJ should have given a hypothetical that limited reaching in all directions rather than just overhead reaching.  Id.  In response, Defendant argues that the record indeed supports an RFC finding that he was limited only as to overhead reaching rather than reaching in all directions.  (D.E. 10, at 2).

The ALJ concluded in his RFC finding that Plaintiff was "limited in reaching with the left, but not the upper right extremity due to decreased range of motion as set out in exhibit 6F/4 and 4F/5."  Tr. 17.  Plaintiff contends that this "reaching" limitation should be interpreted to mean that Plaintiff was unable to "extend[ ] the hands and arms in *any* direction."  (D.E. 9, at 3) (emphasis in original).  In support of this proposition, he cites to a discussion of "reaching" in SSR 85-15, which conforms with the definition provided by other authorities:

> *Reaching*, *handling*, *fingering*, *and feeling* require progressively finer usage of the upper extremities to perform work-related activities.  Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs.  Significant limitations of reaching or handling, therefore, may eliminate a large number of

16

occupations a person could otherwise do.  Varying degrees of
limitations would have different effects, and the assistance of a VS
may be needed to determine the effects of the limitations.

SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985) (emphasis in original).  Because the ALJ's

hypothetical stipulated only that "[h]e would have virtually no overhead with the left upper

extremity," Plaintiff essentially maintains that the vocational expert's answer to the hypothetical

is irrelevant because the ALJ's actual RFC finding was that he could not extend his hands and

arms in any direction.  (D.E. 9, at 4); see Bowling, 36 F.3d at 436 ("Unless the hypothetical

question ... can be said to incorporate reasonably all disabilities of the claimant recognized by

the ALJ, ... a determination of non-disability based on such a defective question cannot stand.").

Plaintiff's reliance on SSR 85-15 is unavailing even if that ruling supplies the default

definition of "reaching" as used by the ALJ in this dispute.  The mere fact that "reaching"

involves "extending the hands and arms in any direction" does not mean a finding by the ALJ

that Plaintiff was "limited in reaching" should be interpreted as a finding that he "cannot extend

his hands and arms in any direction."  Rather, the RFC finding that Plaintiff was "limited in

reaching" is better understood to mean that he was "limited in extending the hands and arms in

certain directions."  Such a reading of the ALJ's RFC finding is consistent with the record and

the testimony of Dr. Cox at the hearing.

Plaintiff dismisses the notion that the ALJ's RFC finding should be construed to establish

only a limitation on overhead reaching rather than reaching in all directions.  (D.E. 9, at 3).  He

argues that the ALJ's citations to Dr. Dolan's assessment at Exhibit 6F/4, Tr. 330, and the range

of motion chart at Exhibit 4F/5, Tr. 324, undercut such an interpretation of his RFC because they

support the conclusion that Plaintiff had limited reaching in all directions.  (D.E. 9, at 3-4).

Contrary to Plaintiff's assertion, however, the two exhibits that the ALJ references do not

entail the drastic conclusion that Plaintiff is wholly incapable of extending his hands and arms in any direction. While Dr. Dolan checked a box on the form indicating that he was limited in reaching in all directions, she explained that his reaching was impaired because his "[range of motion] is limited in left shoulder[:] forward elevation, abduction & external rotation." Tr. 330. These findings match the results detailed in the chart specifying Plaintiff's remaining range of motion. Tr. 324. Nothing in these two exhibits demonstrate that he was totally unable to extend his hands and arms in any direction. Instead, the range of motion chart indicates that his left shoulder retained the ability to elevate, extend, abduct, and rotate to varying degrees. Id. When compared to the range of motion for a normal person, it appears that Plaintiff retained a significant capacity to elevate and extend his left shoulder. Id.

Finally, although Plaintiff is correct that the ALJ "did not specify the degree or severity" of his reaching limitation, (D.E. 9, at 2), such an omission does not warrant an extreme finding that he had simply no reaching ability. At no point did any physician who examined Plaintiff suggest that his left arm was effectively immobile. Moreover, after reviewing the medical record, Dr. Cox testified that, in light of the documented shoulder problems, Plaintiff should only be limited in his ability to reach overhead. Tr. 31, 33. Given that Dr. Cox's residual capacity assessment was based on her evaluation of the medical evidence in the record and are uncontradicted by any examining physician, the ALJ may rely on her assessment. See Villa, 895 F.2d at 1024 ("an ALJ may properly rely on a non-examining physician's assessment when ... those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician") (citation omitted).

Accordingly, it is respectfully recommended that the ALJ's hypothetical question did incorporate the RFC findings, which were supported by evidence in the record.

**B.      The ALJ's Failure To Investigate The Vocational Expert's Testimony Does Not Require Remand.**

Plaintiff challenges the ALJ's decision for failure to inquire whether Ms. Johnson's testimony conflicted with the Dictionary of Occupational Titles ("DOT").  (D.E. 9, at 6).  Noting discrepancies between the vocational expert's testimony and the DOT, he contends that this failure to investigate deprives the ALJ's decision to deny social security benefits of substantial justification.  Id. at 7.  Defendant concedes that "the ALJ did not specifically ask whether the VE's testimony comported with the DOT," but counters that this does not justify remand because Plaintiff's substantial rights were not affected.  (D.E. 10, at 3).

During the hearing, Ms. Johnson testified that Plaintiff could return to his past relevant work as either a fry cook or a restaurant manager as those jobs are performed according to the DOT.  Tr. 55-56.  She described the position of "fry cook" as being performed at the "light" level and carried a Specific Vocational Preparation ("SVP") level of three.  Tr. 56.  The position of "restaurant manager" was also described as a "light" level job, but carried an SVP of five.  Id. Ms. Johnson specifically excluded the position of "fast food cook" because that was a "medium" level job with an SVP of six.  Id.  No specific citations to the DOT were given.  Plaintiff's attorney was given an opportunity to question Ms. Johnson, but failed to raise any discrepancy between her testimony and the DOT listings.  Tr. 58-61.

Plaintiff disputes the existence of any "fry cook" listing in the DOT that can be performed at the "light" level with an SVP of three.  (D.E. 9, at 7).  According to his research, he avers that there are only four DOT listings containing the terms "fry" and "cook" in the title, and that three of them are "medium" level jobs while the last has an SVP of six.  Id.  Plaintiff also asserts that only one DOT entry is titled "restaurant manager," but it has a higher SVP of seven.

19

Id. Because the ALJ "has an affirmative responsibility to ask about any possible conflict between that ... evidence [from the vocational expert] and information provided in the DOT," SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000), Plaintiff submits that the ALJ's decision is without substantial justification.  (D.E. 9, at 7).

The Fifth Circuit has determined that district courts reviewing denials must apply a harmless error analysis.  Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.") (citation omitted).  The Audler court further explained that "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'"  Id. (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).

Defendant insists that Plaintiff's substantial rights have not been affected.  He claims that even if Plaintiff is correct that the only "light" level fry cook and restaurant manager positions have higher SVPs than the vocational expert had represented, the elevated SVP rating is of no consequence because the ALJ provided no restrictions with respect to Plaintiff's ability to learn and perform skilled work.  (D.E. 10, at 4).  Defendant cites to Appendix C of the DOT for further support, noting that the purpose of the SVP rating is to indicate how much time is needed to train a worker to the level of average proficiency in a specific job.  1991 WL 688702 (4th ed. rev. 1991) ("Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.").

The ALJ never determined that Plaintiff had an impairment that warranted an SVP

limitation, Tr. 16-19, nor did Plaintiff ever argue for such a determination at the administrative level.  Moreover, the record uncovers no evidence tending to show that he should only be limited to low-SVP jobs.  Finally, the SVP level, which measures the time workers typically take to learn a job, is not as significant in Plaintiff's claim because he possesses fifteen years of experience in the food industry.  Tr. 194.  Given that Plaintiff has failed to meet his step four burden by showing that he possessed an impairment preventing him from performing his past work as a fry cook and restaurant manager, <u>Bowling</u>, 36 F.3d at 435, the ALJ's determination to the contrary must stand.  This failure is especially pronounced given that Plaintiff's counsel failed to object to Ms. Johnson's testimony or attach any significance to the SVP values at the hearing.  Instead, the proceeding focused almost entirely on whether Plaintiff's physical capabilities precluded employment.

Because the ALJ's decision was nevertheless supported by substantial evidence in the record, it is respectfully recommended that any error attributable to the ALJ's reliance on the vocational expert's representations regarding jobs available to Plaintiff be found harmless.

## V.  <u>RECOMMENDATION</u>

For the reasons stated herein, it is respectfully recommended that Plaintiff's motion for summary judgment, (D.E. 9), be denied.  It is further respectfully recommended that Defendant's motion for summary judgment, (D.E. 6), be granted, and this action be dismissed.

Respectfully submitted this 6th day of March 2012.

BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).